

January 13, 2024

Hon. Rachel P. Kovner
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:    *United States v. Luis Rivas,* **18-CR-398 (RPK)**

Dear Judge Kovner:

      On July 14, 2023, Luis Rivas pled guilty to Count I of the superseding indictment against him, charging him with racketeering in violation of 18 U.S.C. § 1962. As part of the racketeering charge, Mr. Rivas admitted to racketeering act 2 – a Hobbs Act robbery committed on January 8, 2017, and racketeering act 5B – participating in the murder of Julio Vasquez on May 16, 2017. The Probation Department calculates that Mr. Rivas's total offense level is 40, his criminal history category is III,[1] and that his final advisory sentencing guideline is 360 months to life imprisonment. *See* PSR at ¶¶ 98, 104, 135.

      Mr. Rivas's guilty plea was entered pursuant to a plea agreement with the government under Fed. R. Crim. Proc. 11(c)(1)(C), which stipulates a sentence of 420 months' imprisonment, followed by five years' supervised release. At the time of the guilty plea, the Court indicated that it would decide whether or not to accept the proposed guilty plea after reviewing the Presentence Report. The Probation Department recommends acceptance of the plea and imposition of the stipulated 35-year sentence, as does the government. For the reasons set forth below, we urge the Court to accept Mr. Rivas's plea and to impose the agreed-upon sentence.

### A.    Luis Rivas's Personal History and Characteristics[2]

      Luis Rivas was born at home on March 5, 1995 on the island of Zacatilla, El Salvador. He is the youngest of nine children born to the union of Jose Candido Chavarrias and Raimunda Rivas. Luis's father was a fisherman and a farmer, and his mother farmed and maintained the home. While Luis had eight siblings, most had emigrated to the United States by the time he was growing up. Luis spent much of his childhood with his parents and his

---

[1] For reasons explained below, the defense does not agree with the Probation Department's criminal history calculation.

[2] Facts in this section are derived from a mitigation report that was prepared during the capital stage of this case, which relied on a number of interviews with family members and people who knew Luis Rivas in El Salvador.

2

sister, Silvia, who remained on Zacatilla. The family was poor – there was no electricity or running water – but life on the island was simple. He attended the island school which was a short walk up the hill from where he lived and, when he was not in school, he played with his friends on the beach in front of his home. Luis rarely made the twenty-minute boat journey to mainland El Salvador and lived a life that was sheltered from the descent into gang fueled instability and violence that plagued most of the country from the 1990s onward.

The insular nature of Luis's childhood offered him protection that went beyond his physical safety. Luis exhibited symptoms of cognitive and developmental delays from the time he was very young. Luis's mother and sisters report that Luis did not speak until he was about five-years old. When he did begin speaking, he had a speech impediment so severe that he could not say his own name. Luis's sister, Silvia, recalls that Luis referred to himself as "Kiko" because he could not pronounce Luis. Several family and community members noted that he earned the nickname "Half Mute" because of his difficulty communicating. Perhaps because of these deficits, Luis left school after the third grade and never returned, and he still has difficulty reading and writing. Luis experienced other challenges too. Silvia recalls that he was exceptionally sensitive to light and sound. Silvia remembers that Luis became overwhelmed in situations that involved groups of people. She describes taking Luis to a party when he was fifteen years old and being forced to return home because the lights and music were making him "sick." Luis also exhibited impairments with oral comprehension and had difficulty following basic instructions as a child.³

On Zacatilla, Luis's impairments were simply seen as a personality quirk and remained free of stigma. The fact that Luis's special needs went unaddressed did not prevent him from having a rich and meaningful experience within the safe confines of the Zacatilla community. His mother says,

> There was no awareness of special needs in El Salvador. There was an issue with Luis - he barely talked, he couldn't say words right and he often didn't know how old he was, but he was physically playful, so people just laughed.

After leaving school around age 9, Luis started fishing with a neighbor and helping around the house. Later, when his brother, Oscar Rivas, sent money from the United States to buy fishing equipment, he began doing it on his own. According to family members in EL Salvador, Luis spent a lot of time alone when he was a teenager. He never had a girlfriend and did not have a big circle of friends. According to Silvia, Luis was a poor judge of character and was easily influenced by his peers, but she does not recall him getting in a lot of trouble. The entire Rivas family describes Luis as a well-intentioned, but extremely limited, boy.

When Luis was seventeen, the sense of security he felt in Zacatilla evaporated overnight when the bodies of two teenage boys were discovered not far from Luis's home. The murders were an inflection point for the community. The parents of the boys had fled to Zacatilla to escape threats from MS-13, but even Luis's isolated and peaceful community was not safe. Luis's neighbor, Elisette Mejia, recalls that everything changed after the boys' bodies were found:

---

³ Records from both NYC Corrections and the MDC indicate that Luis Rivas has been diagnosed with significant mental diseases and impairments, including schizophrenia, bi-polar disorder, major depressive disorder, and social anxiety. PSR at ¶¶ 122-123.

> Everyone in El Salvador lives in fear of gangs. There was a period of time when we became afraid here too. After the bodies of the boys were found, nobody went out at night. We told our kids that it wasn't safe. Everyone talked about the gangs coming at night.

Another neighbor, Maura Hernandez, recalls that Zacatilla residents began locking their doors and installing bars on their windows. The freedom and safety to which Luis had become accustomed dissipated and was replaced by an atmosphere of fear and vulnerability.

Luis was eighteen when he made the decision to emigrate to the United States. Seven of his eight older siblings were living in New York and Luis planned to live with his oldest brother, Oscar. When Luis finally arrived in New York, he was forced to deal with an environment that was void of the intimacy to which he was accustomed on Zacatilla. Luis's oldest brother, Oscar, took him in and connected him with a construction job, but the warmth he experienced in his El Salvador community was not present in Oscar's home. Moreover, the impairments that were accepted and understood as a personality quirk during his childhood made Luis vulnerable to ridicule and abuse in New York. Perhaps in an effort to find the acceptance and comfort he had felt at home but was now sorely lacking, Luis sought refuge in a "family" that readily accepted him – MS-13.

### B.    Objections to the PSR

On May 17, 2017, Mr. Rivas was arrested for committing a robbery with Anthony Hernandez and other unapprehended individuals. The robbery took place on April 24, 2017. Mr. Rivas pled guilty and was sentenced to 42 months' custody. *See* PSR at ¶ 101. The Probation Department assessed Mr. Rivas three criminal history points according to USSG § 4A1.1. *Id.* Similarly, the Probation Department assessed 1 criminal history point for Mr. Rivas's conviction for assault in aid of racketeering, which is awaiting sentencing before Judge Chen. *See* PSR at ¶ 102.

Both of these convictions constitute relevant conduct for Mr. Rivas's instant racketeering conviction and should therefore not be counted as criminal history. *See e.g. United States v. Shuster*, 361 F. App'x 208, 211 (2d Cir. 2010) ("a sentence for conduct that is relevant conduct under Section 1B1.3 does not result in criminal history points."). Conduct is relevant if it was "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant … during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S. Sentencing Guidelines Manual § 1B1.3(a)(1) (2006); *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008). Relevant conduct can, of course, be uncharged as long as it is proved by a preponderance of the evidence for sentencing purposes. *See United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000) ("'preponderance of the evidence' is the generally applicable standard for a sentencing judge to employ when deciding the weight and effect to accord relevant, uncharged conduct at sentencing.").

In this case, Mr. Rivas pled guilty to Count 1 of the superseding indictment, which charged him with being a member of a racketeering enterprise – namely MS-13 – and engaging in racketeering activity as part of that racketeering enterprise between 2016 and 2019. He

committed both the April 2017 robbery as well as the October 2018 assault in aid of racketeering as part of his membership in, and activities on behalf of, the MS-13 racketeering enterprise.

1. **April 2017 Robbery**

As set forth in the PSR, Mr. Rivas, along with Anthony Hernandez and two others robbed two victims of their money. In the course of the robbery, Anthony Hernandez struck one of the victims in the face with a glass bottle, causing injury. The other victim was also attacked by the unapprehended others with some kind of sharp object. $80 was stolen. PSR at ¶ 101. Like all of the criminal acts charged in the indictment, including several robberies, this uncharged robbery constituted racketeering activity and was thus relevant conduct.

In its pretrial motions in limine, the government notified the Court that it would seek to introduce evidence at Mr. Rivas's trial that "an April 24, 2017 assault and robbery committed by Rivas and other CLS members" was "admissible to prove the existence of the racketeering enterprise, the pattern of racketeering activity and the defendants' motive for committing the charged violent crimes in-aid-of racketeering." Memorandum of Law In Support of Government's Motions In Limine, filed 2/15/23, ECF No. 175 at (15-16). At the June 27, 2023 pretrial conference and oral argument on motions in limine, the government vociferously argued for admission of the April 2017 robbery, stating that Mr. Rivas committed the robbery with fellow MS-13 members including Anthony Hernandez, aka "Mafia,"[4] and that this proved the existence of the enterprise and the pattern of racketeering activity. The Court, in its June 28, 2023 Order, admitted this evidence: "4. The government's motion to admit evidence that Rivas committed an assault and robbery with other MS-13 members on April 24, 2017, is granted, subject to objections under Federal Rule 403 as stated on the record."

As the government urged, and the Court accepted, Mr. Rivas's April 2017 robbery, committed with other MS-13 members during the time period of the racketeering count to which he pled guilty was part of his membership and participation in the racketeering enterprise. Accordingly, because the robbery was "committed . . . .during the commission of the offense of conviction," with the same motive, namely to maintain or increase his position in the racketeering enterprise, the robbery constitutes relevant conduct to the count of conviction. USSG §1B1.3(a)(1). As such, it should not be considered as part of Mr. Rivas's criminal history and should not have been assessed 3 criminal history points by the Probation Department.

2. **Assault in Aid of Racketeering**

On October 22, 2018, Mr. Rivas participated in a gang assault with two other MS-13 members, Dennis Cabrera and Javier Rodriguez. They attacked a member of a rival gang, the Latin Kings, while all incarcerated at the Manhattan Detention Complex. PSR at ¶ 102. Mr. Rivas pled guilty to this crime in federal court in the Eastern District. During his guilty plea on June 4, 2019, Mr. Rivas admitted that he was a member of MS-13 and that he committed the assault as part of his membership activities:

---

[4] For example, trial witness Santos Amador Rios discussed Anthony Hernandez's membership and role in MS-13 in his debriefings with law enforcement. *See* 3500 SAR-24, at 5.

5

>THE DEFENDANT:  So since I got involved in MS-13, the gang, I knew that my enemies will always be my enemies and I have to fight them.
>
>THE COURT:  So you were a member of MS-13 at the time you engaged in this assault?
>
>THE DEFENDANT:  Yes.
>
>THE COURT:  And the reason that you and the others engaged in the assault is because you were protecting your own gang members; is that right?
>
>THE DEFENDANT:  Yes, something like that.

Plea Transcript at 24, ECF. No. 175-1

Like the April 24 robbery, Mr. Rivas's 2018 assault in aid of racketeering constitutes relevant conduct.  In its motions in limine, the government sought introduction of Mr. Rivas's guilty plea as well as other details about the assault in an effort to prove the existence of the enterprise and his membership in it.  *See* Memorandum of Law In Support of Government's Motions In Limine, filed 2/15/23, ECF No. 175 at 29 ("At trial, the government intends to introduce evidence of Rivas's guilty plea as evidence of the existence of the charged racketeering enterprise, Rivas' membership therein and his racketeering motive for murdering Vasquez.").  The defense did not contest that the plea was admissible for this purpose, objecting only to additional details on a Rule 403 basis.  *See* ECF. No. 226.  The Court admitted relevant portions of Mr. Rivas's guilty plea on the grounds articulated by the government.  *See* Order, 6/28/23.

Mr. Rivas pled guilty to being a member of a racketeering enterprise – MS-13 – and engaging in the racketeering activities of the enterprise during the years 2016 to 2019.[5]  Mr. Rivas further admitted to engaging in a 2018 assault in aid of that same racketeering enterprise to protect or further his position within it.  Clearly, that 2018 conviction constitutes relevant conduct and should therefore not be counted for Mr. Rivas's criminal history or have been assessed one criminal history point by the Department of Probation.  *See* PSR at ¶ 102.[6]

C. **Conclusion**

We respectfully urge the Court to accept the plea agreement signed by all parties and to impose the agreed upon sentence of 420 months, followed by 5 years supervised release.  A twenty-two year old man (at the time), with a third grade education and significant mental health impediments, committed a horrific crime.  That conduct, despite the presence of mitigating factors, warrants a severe sentence, which 35 years surely is.  35 years is above the bottom of the 360 months to life guideline found by the Probation Department, and well above

---

[5] Since Mr. Rivas has been incarcerated since May 17, 2017, the government's theory as articulated in the indictment was that his racketeering activities continued for at least for another two years.

[6] If the Court agrees, paragraphs 101-104 and paragraph 135 of the PSR must be amended.  Moreover, the guideline range in ¶ 135 should be changed to 292-365 months.

the guideline range of 292-365 months that would apply if Mr. Rivas were properly found to be in criminal history category 1 (*see* above). 35 years is a very substantial sentence for Mr. Rivas's crimes and when he emerges from federal custody in his 50s, he will be deported to El Salvador to live out his days.

Luis Rivas's membership in MS-13 affected and ruined the lives of others. But it also ruined his life. It is worth remembering that Julio Vasquez was murdered because he disobeyed an order to kill another MS-13 member. PSR ¶ 22. Once Mr. Rivas and Mr. Leiva were ordered to kill Julio Vasquez, there is no doubt the same fate awaited them if they disobeyed. That is not a defense but it explains the nature and culture of the gang of which Mr. Rivas was a part. With his limited intelligence and education, with his desperation to feel like he belonged, he made the fateful decision to join MS-13. Once indoctrinated, he had little choice. Under the particular circumstances of this case, 420 months in prison is sufficient but not greater than necessary to satisfy the goals of sentencing under 18 U.S.C. § 3553(a).

Thank you for your consideration.

Respectfully submitted,

/s/

Florian Miedel
Jeremy Schneider
*Attorneys for Luis Rivas*

Cc:     All Counsel